SOUTHWEST WILLIAMSON COUNTY
COMMUNITY ASSOCIATION,
INC.

v.

Rodney E. SLATER, et al.

No. 3:97–0734.

United States District Court,
M.D. Tennessee,
Nashville Division.

Sept. 10, 1999.

**876**

Joe W. McCaleb, Hendersonville, TN, Richard Parrish, Charlottesville, VA, for plaintiff.

Michael Roden, Nashville, TN, Donald Corlew, Nashville, TN, for defendant.

## *MEMORANDUM*

CAMPBELL, District Judge.

### I. *Introduction*

Pending before the Court are Plaintiff's Motion For Preliminary Injunction (Docket No. 83) and Plaintiff's Motion To Strike (Docket No. 100). The Court held a hearing on these Motions on August 30, 1999. For the reasons set forth below, the Motions are DENIED.

### II. *Factual and Procedural Background*

#### A. *Procedural Background*

Plaintiff, a non-profit corporation formed of members who live and work in Williamson County, brought this action in July, 1997, seeking to enjoin the continued construction of the 840 South Highway Project,[1] pending the completion of a final environment impact statement regarding the Project. Named as Defendants are Rodney Slater, Secretary of the United States Department of Transportation; Jane F. Garvey, Acting Administrator of the Federal Highway Administration ("FHWA"); James Scapellato, Division Administrator of the Federal Highway Administration; and John Bruce Saltsman, Sr., Commissioner of the Tennessee Department of Transportation. In its origi-

---

1. The parties dispute whether the road should be called Interstate 840 South or State Route 840 South. The Court will refer to the road as simply 840 South.

nal Complaint, Plaintiff alleged that the Defendants failed to comply with certain provisions of the National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq.* ("NEPA"), and the Intermodal Surface Transportation Efficiency Act, 23 U.S.C. §§ 134, 135 ("ISTEA"). Plaintiff asserted federal jurisdiction, in part, based on the Administrative Procedures Act, 5 U.S.C. §§ 701, *et seq.* ("APA").

Ruling on motions filed by the Defendants, the Court dismissed the NEPA claims as barred by the applicable statute of limitations (Docket Nos. 41, 42). The Court dismissed the ISTEA claim because the statute provides no private right of action, and declined to exercise supplemental jurisdiction over a state law claim based on the Petroleum Products And Alternative Fuels Tax Act, Tenn.Code Ann. § 67–3–2003.

On appeal, the Sixth Circuit affirmed the Court's dismissal of the NEPA claims on statute of limitations grounds, except as to an Environmental Assessment ["EA"] prepared by the State[2] upon which the FHWA had taken no action. With regard to this NEPA claim, the appeals court remanded the case "for a determination as to whether the project is a 'major federal action' requiring FHWA to issue a FONSI [Finding of no significant impact] or an EIS [Environmental Impact Statement] in response to the third EA [regarding a corridor of the highway]." *Southwest Williamson County Community Association v. Slater*, 173 F.3d 1033, 1037 (6th Cir. 1999) (footnote omitted). The court also reversed the dismissal of the ISTEA claim, and directed the Court to revisit its decision to decline supplemental jurisdiction in light of the potential continued viability of the federal claims.[3]

· On remand, the Plaintiff filed an Amended Complaint that asserted only the NEPA claim regarding the corridor, and the state law claim. (Docket No. 74).

Plaintiff has abandoned the ISTEA claim. No federal claims are pending against the State Defendant.

**B.** *The 840 South Highway Project*

The 840 South Highway Project is a proposed 77–mile highway connecting the western Middle Tennessee area with the eastern Middle Tennessee area through a route south of Nashville from Interstate 40 West to Interstate 40 East. The Project is divided into three segments. The first segment, which begins at the I–40E interchange and ends at the I–24 interchange, has been completed. Portions of the second segment, which begins at the I–24 interchange and ends at the I–65S interchange, are under construction. As for the third segment, beginning at the I–65S interchange and ending at the I–40W interchange, only construction on the western end has begun.

Although the State initially, in November, 1991, sought federal funding for the Project, it is undisputed that construction of the Project has been funded solely by the State. Notwithstanding the lack of federal funding, Plaintiff contends that the Project is effectively controlled by agencies of the federal government.

### III. *The Preliminary Injunction Motion*

**A.** *Factors to consider.*

 Plaintiff requests that the Court enjoin the continued construction of 840 South pending the completion of a Final EIS for the highway. In determining whether to issue a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, the Court is to consider: (1) whether the movant has shown a strong or substantial likelihood of success on the merits; (2) whether irreparable harm will result without an injunction; (3) whether issuance of a preliminary injunction will result in substantial harm to oth-

---

**2.** NEPA allows a state agency to prepare an Environmental Assessment for a federal agency under certain conditions. 42 U.S.C. § 4332(2)(D).

**3.** The court also ruled that the State Defendant could not be sued under the APA. 173 F.3d at 1035–36.

ers; and (4) whether the public interest is advanced by the injunction. *Michigan State AFL—CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir.1997).

### B. *Likelihood of success on the merits*

#### 1. *The NEPA claim*[4]

NEPA was designed to ensure that federal agencies take a "hard look" at the effect of their actions on the environment. *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). To fulfill this purpose, NEPA requires federal agencies to consider the environmental consequences of "major Federal actions significantly affecting the quality of the human environment . . ." 42 U.S.C. § 4332(2)(C). If the significance of the environmental consequences of a proposal is not apparent, the agency may prepare an environmental assessment to determine whether to prepare an environmental impact statement or a finding of no significant impact. 40 C.F.R. §§ 1501.3, 1501.4, 1508.9. If the agency issues a finding of no significant impact, NEPA compliance is complete. 40 C.F.R. § 1501.4; *Sierra Club v. Slater*, 120 F.3d at 635.

NEPA does not require a particular outcome, but simply imposes a particular process designed to ensure that agencies consider the environmental impact of their decisions. *Kleppe*, 96 S.Ct. at 2730 n. 21. That process must be followed, however, only if a project constitutes a "major federal action."

Thus, the threshold issue in this case is whether the 840 South Highway Project is a major federal action.[5] Plaintiff concedes that the Federal Defendants have not funded this project. But, as the Sixth Circuit stated in remanding this case, "the 'absence of federal funding is not necessar-

ily dispositive in determining whether a highway project is imbued with a federal character.'" 173 F.3d at 1037 (quoting *Historic Preservation Guild of Bay View v. Burnley*, 896 F.2d 985, 990 (6th Cir. 1989)). Plaintiff contends that the 840 South Highway Project is a major federal action within the meaning of NEPA, based on the following actions taken by agencies of the federal government in connection with the project:

1. Federal approval of the design, construction, location and alignment of 840 South with existing interstate highways (Two EAs/FONSIs) [The interchange approvals];

2. FHWA consultation with TDOT [Tennessee Department of Transportation] and the National Park Service to determine where 840 South will cross the federally-protected Natchez Trace Parkway;

3. The Secretary of the Interior's permission, control and approval of a right-of-way across the federally-protected Natchez Trace Parkway including mitigation to historic properties pursuant to Section 106 of the National Historic Preservation Act and mitigation and consultation to protect the Eggert sunflower pursuant to the Endangered Species Act (Draft EA has been issued);

4. Secretary of the Army's review, approval and permitting three separate crossings of waters of the United States including filling wetlands along the 840 South route (Two EA/FONSIs issued);

5. FHWA approval of the Nashville Long Range Transportation Plan Conformity Redetermination required by the Clean Air Act Amendments of 1990 without which the continued construction of 840 would not be allowed;

---

4. The Court reviews the Federal Defendants' actions under the APA to determine whether the agency's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A); *Sierra Club v. Slater*, 120 F.3d 623, 632 (6th Cir.1997).

5. Although the pivotal issue in this case is whether 840 South is a "major federal action," the Federal Defendants do not address how the issue applies to the totality of the federal actions alleged by the Plaintiff. The Federal Defendants have failed to address adequately the question that the Sixth Circuit Court of Appeals directed this Court to answer.

6. The FHWA funding of a study resulting in the Air Quality Conformity Redetermination mentioned above; FHWA funding of the NMPO's [Nashville–Metropolitan Planning Organization] Unified Planning Work Programs from 1995 through 1999 which included three traffic capacity analysis for interchanges in Wilson County, Rutherford County and Williamson County; and

7. The formal application by the State Defendant to the Federal Defendant in November, 1991, for federal interstate status, subsequently withdrawn for two principal reasons: (1) The State did not want to comply with NEPA; and (2) The State can build 840 South, then apply for interstate status at a later time, which would be granted after only a simple inspection to determine whether or not the road was built according to geometric designs.

(Memorandum In Support Of Plaintiff's Motion For Preliminary Injunction, at 20–21 (Docket No. 82)).

Plaintiff urges that the Court define the phrase "major federal action" based on regulations issued by the Council on Environmental Quality ("CEQ"), and the Fourth Circuit's opinion in *Maryland Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039 (4th Cir.1986).

The CEQ regulations define "major federal action" as

"Major Federal action" includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (§ 1508.27).[6] Actions include the circumstance where *the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.[7]

40 C.F.R. § 1508.18.

In *Gilchrist*, which was decided in 1986, the plaintiff sought to enjoin the construction of a county highway designed to pass through a state park. The court found that the highway project involved major federal action because approval of the Secretary of the Interior was needed for the highway to cross through the state park;[8]

---

**6.** Section 1508.27 discusses the meaning of the term "significantly." 40 C.F.R. § 1508.27.

**7.** The regulation further provides that:

(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§ 1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 1221 et seq., with no Federal agency control over the subsequent use of such funds. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.

(b) Federal actions tend to fall within one of the following categories:

(1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 et seq.; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(2) Adoption of formal plans, such as official documents prepared· or approved by federal agencies which guide or prescribe alternative uses of federal resources, upon which future agency actions will be based.

(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

40 C.F.R. § 1508.18.

**8.** According to the court, the park had been purchased, in substantial part, with federal funds, and therefore, converting the land in the park to other than recreational use required the approval of the Secretary of the Interior under the Conservation Act. 808 F.2d at 1042.

a permit from the Army Corps of Engineers was needed, under the Water Act, 33 U.S.C. § 1344, because a wetlands area would be affected by construction of the highway; and if the county sought additional federal funds for the construction of the highway, it would be required to seek the approval of the Secretary of Transportation to use park land for a transportation project under the Transportation Act, 49 U.S.C. § 303(c). 808 F.2d at 1042.

In reaching its decision, the court stated: "A non-federal project is considered a 'federal action' if it cannot 'begin or continue without prior approval of a federal agency.'" 808 F.2d at 1042 (quoting *Biderman v. Morton*, 497 F.2d 1141, 1147 (2nd Cir.1974)). The court remanded the case to the district court to consider plaintiffs' request for a preliminary injunction, specifically, the issue of whether the project violated NEPA by "limiting 'the choice of reasonable alternatives' available to federal decision-makers." 808 F.2d at 1043 (citing 40 C.F.R. § 1506.1(a)(2) (1985)).[9]

Most courts, including the Sixth Circuit, have not followed the broad interpretations of *Gilchrist* and the CEQ regulation urged by the Plaintiff. In determining whether a project constitutes major federal action, most circuit courts look to whether a federal agency has the ability to influence or control the non-federal activity. *Ross v. Federal Highway Administration*, 162 F.3d 1046, 1051 (10th Cir.1998); *United States v. Southern Florida Water Management District*, 28 F.3d 1563, 1572–73 (11th Cir.1994) (NEPA only applies to federal decision-making, not federal involvement in non-federal decision making); *Sugarloaf Citizens Ass'n v. Federal Energy Regulatory*, 959 F.2d 508, 512 (4th Cir.

1992); *Save Barton Creek Ass'n v. Federal Highway Administration*, 950 F.2d at 1135; *Village of Los Ranchos de Albuquerque v. Barnhart*, 906 F.2d 1477, 1482 (10th Cir.1990).

In *Save Barton Creek Ass'n v. Federal Highway Administration*, the Fifth Circuit construed the CEQ regulation in considering whether a proposed highway project constituted major federal action. The project involved the construction of a 5.5 mile extension of an existing freeway, MoPac South, as well as a segment of the Austin Outer Loop, a proposed 82–mile circumferential freeway around Austin, Texas, which had been divided into five segments for planning purposes. 950 F.2d at 1130–31. The plaintiffs argued that MoPac South and the Austin Outer Loop were major federal actions, and the district court had agreed, relying on the language of the regulation. 950 F.2d at 1134.

In discussing the regulation, the court stated "the district court appears to have placed undue reliance on only a portion of the CEQ's regulation by focusing solely on the 'potentially subject' factor, while dismissing with seeming facility the 'Federal control and responsibility' factor." 950 F.2d at 1134. Federal involvement, the court explained, requires "the ability to influence or control the outcome in material respects." *Id.* (quoting W. RODGERS, ENVIRONMENTAL LAW, § 7.6, at 764 (1977)). The NEPA process "is supposed to inform the decision-maker [which] presupposes [the decision-maker] has judgment to exercise.'" *Id.*

Consequently, the court reasoned, that the state structured the project so as to preserve its eligibility for future federal

---

9. In a subsequent case, the Fourth Circuit limited this aspect of the *Gilchrist* holding:

... [The city of Virginia Beach] seeks to perform relatively minor work on aspects on the pipeline outside FERC's [Federal Energy Regulatory Commission] jurisdiction that will save precious time and money if the project is approved ... If the rule were such that any construction that could, in even the smallest degree, bring public and political pressure on agencies is prohibited until final agency approval of all aspects of the project, the prohibition would logically extend to any de minimis construction.... This is not the intended reach of *Gilchrist*. Thus we hold that construction which lies beyond the boundaries of FERC's jurisdiction can be enjoined only when it has a direct and substantial probability of influencing FERC's decision ... *State of North Carolina v. City of Virginia Beach*, 951 F.2d 596, 603 (4th Cir.1991).

funding does not render the project a major federal action. 950 F.2d at 1135. In any event, the court explained, an environmental impact statement would not be required until there was a "proposal" for federal funding as set forth in NEPA, 42 U.S.C. § 4332(2)(C). 950 F.2d at 1136. The court also rejected the plaintiffs' argument that federal action was presented by the state's preliminary consideration during the developmental stage of an application for federal funds, noting that "Segment 3 is just one of many state projects that has federal assistance at an exploratory stage and then is completed wholly through state funding." 950 F.2d at 1137.

In *Macht v. Skinner*, 916 F.2d 13, 19 (D.C.Cir.1990), the D.C. Circuit determined that the holding in *Gilchrist* should have a narrow application. The *Macht* court considered whether major federal action was involved in a 22.5–mile Light Rail Project to be funded by state and local governments, and the possible construction of three extensions to the Project for which the state was considering requesting federal funds. 916 F.2d at 15. The court rejected the plaintiffs' claim that there was major federal action because (1) the Urban Mass Transit Administration had given the state of Maryland $2.5 million for preliminary engineering studies and environmental impact statements for the proposed future extensions to the project; and (2) Maryland was required to obtain a wetlands permit from the Army Corps of Engineers in order to complete the state-funded portion of the Project. 916 F.2d at 15–20.

The court determined that the preliminary studies did not constitute major federal action because:

> ... UMTA's decision to fund preliminary studies, in and of itself, will have no impact on appellants or the environment. UMTA has expressly stated that its decision to provide funding for alternative analyses 'is not a commitment to

fund the construction of any project that may result.'

916 F.2d at 17. Similarly, the court concluded that Maryland's plan to request a UMTA grant to build the extensions did not constitute major federal action because "... there is a wide gulf between what a state may want and what the federal government is willing to provide." 916 F.2d at 17.

Distinguishing *Gilchrist*, the court also explained that the Project was not "federalized" because the state was required to obtain a wetlands permit from the Army Corps of Engineers:

> *Gilchrist* did not hold that the state had to comply with NEPA because the approval of several federal agencies was a necessary precondition to the state project. Instead, *Gilchrist* held that because the state needed permits and *discretionary* approval from *several federal agencies* in order to build a *substantial* part of the highway, the state could not construct any portion of the highway until the federal agencies had approved the project in compliance with NEPA. The reasoning of the Fourth Circuit in *Gilchrist* is sound: the state may not begin construction of any part of a project if the effect of such construction would be to limit significantly the options of the federal officials who have discretion over substantial portions of the project. Nevertheless, we decline to extend *Gilchrist* to this case where the only federal involvement is the issuance of a wetlands permit covering a maximum of 3.58 acres of the 22.5–mile Project.

916 F.2d at 19 (emphasis added).

Although it did not address the issue in depth, the Sixth Circuit discussed the necessity of federal involvement under NEPA in *Historic Preservation Guild of Bay View v. Burnley*, 896 F.2d at 990, a case involving an allegation of improper segmentation of a highway project.[10] As

---

10. A plaintiff alleging improper segmentation seeks to demonstrate that the project is divided into segments in order to avoid the application of NEPA to certain of those segments. DANIEL MANDELKER, NEPA LAW AND LITIGATION, § 9.04, at 9–18 (2nd ed.1998). In this case,

noted above, the *Burnley* Court explained that:

> [The] absence of federal funding is not necessarily dispositive in determining whether a highway project is imbued with a federal character ... The absence of federal funding may not excuse non-compliance if this highway project at issue is found to be segments of an overall federal construction project ... On the other hand, '[f]ederal action is typically present only when a project is wholly or partly federally funded.' ... The fact that a project has been designed in order to preserve the options of federal funding in the future is not enough, standing alone, to make it a federal project.

896 F.2d at 990–91 (citations omitted).

With this authority in mind, the court will consider Plaintiff's list of federal actions involving the 840 South Highway Project. Plaintiff argues that major federal action is established by the FHWA's approval of the four interchange access points of 840 South with existing interstates; the Secretary of the Army's issuance of wetlands permits; and the requirement that the State obtain the approval of the Secretary of the Interior for a right-of-way across the Natchez Trace Parkway.

The Court is not persuaded, however, that these actions give FHWA authority to control the 840 South Highway Project and thereby turn it into a "major federal action." As noted above, in *Macht*, the court explained that the rail project at issue was not "federalized" because the state was required to obtain a wetlands permit from the Army Corps of Engineers covering a maximum of 3.58 acres of the 22.5 mile project. 916 F.2d at 19. Similarly, the areas controlled by FHWA, the National Park Service and the Army Corps of Engineers constitute a very small percentage of the overall 77–mile 840 South project.

The Court notes that these agencies recognized the applicability of NEPA in connection with their limited involvement with the 840 South Project. Prior to FHWA's approval of the interchange access points, the State prepared EAs, and the FHWA issued FONSIs as to each.[11] The Army Corps of Engineers has issued two FONSIs in response to two EAs prepared by the State regarding these permits. (Exhibits I, J and K to Amended Complaint). Finally, the State has prepared a draft EA [12] regarding the Parkway crossing, and the Plaintiff is free to contest it pursuant to NEPA.[13] The Court also notes that the

---

Plaintiff is no longer pursuing a segmentation argument. (Amended Complaint, at 6 (Docket No. 74)).

11. At the hearing, Plaintiff argued that the language in FHWA's interchange approval memorandum created continuing jurisdiction of the FHWA over the Project. The last sentence of the Memorandum states: "Therefore, the additional access points necessary for construction of the I–40/State Route I–840 interchange are approved subject to the State's compliance with applicable Federal requirements." ("Federal Defendant's Documents" (Docket No. 76)). The Court is not persuaded, however, that through this language, FHWA intended to retain control over the entire 840 South Project, or that FHWA would be authorized by statute to exert such control under these circumstances. *See Southwest Williamson County Community Association, Inc. v. Slater*, 173 F.3d at 1036–37 (Issuance of FONSI represents the completion of agency's decision-making process, and therefore, constitutes "final agency action.").

Also, the statute of limitations has run on the interchange FONSIs. *Id.*

12. A biological assessment regarding the impact of the Parkway crossing on the habitat of the Eggert's Sunflower, proposed for listing as a threatened species, was approved by the United States Fish and Wildlife Service in December, 1998. (Exhibit H to Amended Complaint). The Service ultimately determined that the crossing was not likely to adversely affect the plant. (*Id.*)

13. Although Plaintiff argues that FHWA has consulted with the State and the National Park Service to determine where 840 South will cross the Natchez Trace Parkway, this consultation appears to have taken place early in the process when federal funding was contemplated. (Exhibits C, D, and E to Amended Complaint). The Court is not persuaded that this initial "consultation" between FHWA and the National Park Service about the Parkway crossing gave FHWA the authority to control

Plaintiff has not named either the Secretary of the Interior or the Secretary of the Army as a party to this action.

Plaintiff also argues that FHWA's approval of certain state activities under IS-TEA constitutes major federal action. The ISTEA claim presented on appeal has been abandoned by Plaintiff.

ISTEA was enacted in an effort "to develop a National Intermodal Transportation System that is economically efficient and environmentally sound, provides the foundation for the Nation to compete in the global economy, and will move people and goods in an energy efficient manner." Intermodal Surface Transportation Efficiency Act of 1991, Pub.L. No. 102–240, § 2, 105 Stat.1914 (1991). One of the methods devised by Congress to accomplish this goal was to require state and local governments to develop "transportation plans and programs" for areas within their respective jurisdictions through a process that provides "for consideration of all modes of transportation and shall be continuing, cooperative, and comprehensive to the degree appropriate, based on the complexity of the transportation problems to be addressed." 23 U.S.C. §§ 134(a)(2), (4); 135(a)(2), (4).

Regulations implemented pursuant to ISTEA require the State to submit a "state transportation improvement plan" to FHWA every two years for certification that the planning process is being carried out in accordance with certain federal laws, including, under certain circumstances, sections 174 and 176(c) and (d) of the Clean Air Act, 42 U.S.C. §§ 7504, 7506(c), (d). 23 C.F.R. § 450.220(a).

In this case, the State developed a state transportation improvement plan that included the 840 South Highway Project. That plan was determined to be in compliance with the Clean Air Act by FHWA,

the Federal Transit Administration, and the Environmental Protection Agency during August and September, 1998. (Exhibit L to Amended Complaint (Docket No. 74)). The EPA approval letter does not specifically mention 840 South:

... Criteria included in the transportation conformity rule for ozone maintenance areas stipulate that a regional analysis of transportation plans and Transportation Improvement Programs must satisfy the emissions budget test for volatile organic compounds (VOCs) and oxides of nitrogen (NOx)....

\* \* · \* \* \* \*

EPA's review of the Nashville Long Range Transportation Plan conformity redetermination indicates the Year 2015 LRTP [long range transportation plan] update for the affected areas satisfies the applicable emissions budget test criteria and complies with the air quality analysis procedures outlined in the transportation conformity rule for ozone maintenance areas ...

(Exhibit L to Amended Complaint).

Plaintiff contends, but does not cite any authority on this point, that without this approval, continued construction of the 840 South Highway Project would cease.[14] The Court is not persuaded, however, that the ISTEA approval process provides the FHWA with the ability to control the state-funded 840 South Highway Project. The Secretary's compliance determination under ISTEA is limited to the those areas listed in the statute and regulations, including compliance with Title VI of the Civil Rights Act and provisions of the Americans with Disabilities Act. *See* 23 C.F.R. § 450.220(a). The provisions of IS-TEA, standing alone, do not give the Secretary the authority to control a particular project included in the plan. *See also*

the 840 South Highway Project once the State withdrew its request for federal funds.

14. Subsection (i)(5)(C) of Section 134 provides that if the Secretary of Transportation decides not to certify a metropolitan planning

process, he "may withhold up to 20 percent of the apportioned funds attributable to the transportation management area under this title and chapter 53 of title 49." *See also* 23 C.F.R. § 334(f).

*Atlanta Coalition on the Transportation Crisis, Inc. v. Atlanta Regional Commission,* 599 F.2d 1333, 1344–44 (5th Cir.1979) (Federal decision whether to certify Regional Development Plan prepared by state and local authorities under 23 C.F.R. Part 450 does not entail the exercise of significant discretion for purposes of NEPA).

Furthermore, through an amendment adopted in 1998, Congress made clear that federal approval of state and local transportation plans does not constitute federal action under NEPA:

> Since plans and programs described in this section are subject to a reasonable opportunity for public comment, since individual projects included in the plans and programs are subject to review under the National Environmental Policy Act of 1969 (42 U.S.C. § 4321, et seq.), and since decisions by the Secretary concerning plans and programs described in this section have not been reviewed under such Act as of January 1, 1997, any decision by the Secretary concerning a plan or program described in this section shall not be considered to be a Federal action subject to review under the National Environmental Policy Act of 1969 (42 U.S.C. § 4321, et seq.).

23 U.S.C. §§ 135(i); 134(*o*).

■ Plaintiff also argues that federal action is involved in the Project because federal funding has been provided for certain transportation studies, which included discussions of the 840 South Highway Project. As noted above, however, the *Macht* court, and several other courts have agreed, that federal funding of preliminary studies regarding a project do not turn that project into a major federal action because the federal agency has not committed to actually participate in the project under consideration. *Macht v. Skinner,* 916 F.2d at 16; *Village of Los Ranchos de Albuquerque v. Barnhart,* 906 F.2d at 1481–82. *See also Atlanta Coalition on the Transportation Crisis, Inc. v. Atlanta Regional Commission,* 599 F.2d at 1344–

49 (Federal funding for Regional Development Plan prepared by state and local authorities does not constitute major federal action). The FHWA's funding of these transportation studies does not authorize it to control the 840 South Highway Project.

Finally, Plaintiff alleges that major federal involvement is established by the State's application to the FHWA in November, 1991 for interstate status for 840 South, which was withdrawn in January, 1992. (Exhibit B to Amended Complaint). Plaintiff contends the application was withdrawn because the State did not want to comply with NEPA, and because the State can build 840 South, then request federal interstate status.

The Tenth Circuit has held that a decision to withdraw a request for federal funds for a segment of a federally-funded project can occur so late in the process that NEPA still applies. In *Ross v. Federal Highway Administration,* 162 F.3d at 1052–53, the court explained that:

> At the advanced stage of the trafficway project, it was simply too late for the state of Kansas to convert the eastern segment into a local project. Since 1986, local, state and federal authorities scheduled, programmed and worked on the trafficway as a joint federal-state project. The federal nature of the trafficway was so pervasive that the Kansas authorities could not rid the project of federal involvement simply by withdrawing the last segment of the project from federal funding.

In this case, unlike *Ross,* however, the application for funding was withdrawn three months after it was submitted, and federal funds have not been expended on any segment of the 840 South Highway Project.

■ Furthermore, as discussed above, the courts have held that early coordination or compliance with the eligibility requirements for federal funding, or designing a project so as to preserve the option

of federal funding in the future, standing alone, will not convert a project into a major federal action. *Save Barton Creek,* 950 F.2d at 1135–36; *Village of Los Ranchos,* 906 F.2d at 1480–81 (State's voluntary request that FHWA approve an EIS for at state-funded project does not federalize the project); *Historic Preservation Guild of Bay View,* 896 F.2d at 990–91; *Atlanta Coalition on the Transportation Crisis, Inc. v. Atlanta Regional Commission,* 599 F.2d at 1346–47 (Structuring a Regional Development Plan to preserve future federal funding does not constitute major federal action); *United States v. Southern Florida Water Management District,* 28 F.3d at 1572–73 ("The possibility that federal funding will be provided in the future is not sufficient to federalize a state project, even when such funding is likely.")

■ Accordingly, the Court is not persuaded that major federal action is established by the State's withdrawn application for federal funding.

Plaintiff argues that the State seeks to avoid meaningful application of NEPA here by completing 840 South, then seeking designation of 840 South as a route on the Interstate System from the Secretary of Transportation under 23 U.S.C. § 103(c)(4).[15] Plaintiff initially argued to this Court and the Sixth Circuit that the State could obtain reimbursement from FHWA for the costs of constructing 840 South after it was built without NEPA compliance. At the hearing, Plaintiff abandoned this claim and instead argued that the State could seek "interstate status" from FHWA for the completed Project. Plaintiff does not argue that such a designation would be accompanied by federal funding.

■ The possibility that the FHWA may be asked to designate 840 South as an interstate sometime in the future, without more, does not convert the Project into a major federal action because that possibility does not rise to the level of a proposal for agency action under NEPA.[16] *Kleppe,* 96 S.Ct. at 2726. In any event, the action for which Plaintiff seeks an environmental impact statement is the construction of 840 South, not the subsequent designation of the completed Project as an interstate.

Although Plaintiff's argument that the State should take a hard look at the environmental consequences of its highway projects has appeal, without a state equivalent to NEPA, the State is not required to prepare an environmental impact statement regarding non-federal projects.

### 2. The state law claim

In connection with the state law claim, Plaintiff asked at the hearing that the Court issue an injunction requiring the State to build 840 South as an interstate highway. The State has filed a Motion For Summary Judgment (Docket No. 86) in which it argues that the Court should dismiss the state law claim because it is without merit, or based on the abstention doctrine because the Plaintiff is litigating the same issue in state court. The Court concludes that Plaintiff does not have a substantial likelihood of succeeding on its state law claim based on the abstention doctrine. *See Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

### C. Other factors

For purposes of evaluating irreparable harm, harm to others, and the public interest, the Court will assume that the 840 South Highway Project constitutes major federal action under NEPA. The Court will also assume that irreparable harm is established because once construction be-

---

**15.** Plaintiff initially cited 23 U.S.C. § 139 as the interstate designation statute. That statute was repealed on June 9, 1998, and certain of its provisions apparently have been incorporated into 23 U.S.C. § 103(c)(4). *See* Pub.L. No. 105–178, title I, § 1106(c)(2)(A).

**16.** The FHWA is required to comply with NEPA in making the decision whether to grant the designation.

886

gins in a particular area, it is unlikely that area can be returned to its earlier state.

On the other hand, the cost of halting construction of the highway at this point would be substantial. Government counsel represents that approximately $143,000,000 has been spent on the 840 South Highway Project, and contracts totaling approximately $60,000,000 have been issued for portions of the highway under construction. (Federal Defendants' Opposition To Plaintiff's Request For A Preliminary Injunction, at 13 (Docket No. 90)). Furthermore, there are also residents of the affected areas who would benefit from an efficient transportation system along the lines of the one proposed.

Finally, Plaintiff's delay in bringing suit weighs against the issuance of injunctive relief. Plaintiff admits that public hearings regarding this project began as early as 1986, and that the State issued its EAs for two of the interchange access points as early as 1988. Plaintiff did not bring suit, however, until 1997.

Based on the testimony and exhibits admitted at the preliminary injunction hearing, statements and representations of counsel at the hearing, and the entire record in this case, this Court finds that Plaintiff has not carried its burden of showing that it is entitled to a preliminary injunction in this case. Most importantly, Plaintiff has failed to show a strong or substantial likelihood of success on the merits. Therefore, the Court concludes that Plaintiff's request for a preliminary injunction should be denied.

### IV. *Motion To Strike*

In its Motion To Strike (Docket No. 100), Plaintiff argues that the Court should not consider the State Defendant's Response In Opposition To Plaintiff's Motion For Preliminary Injunction As To Count 3 Of The Amended Complaint (Docket No. 96) because it was filed after the deadline imposed by a previous Order.

Plaintiff has not shown any prejudice resulting from the delay in receiving the State's Response, which is a two-page doc-ument referring to the State's previously-filed Motion For Summary Judgment, and a document issued in a state administrative action in which the Plaintiff is a party. Accordingly, the Motion is DENIED.

It is so ORDERED.