**REMAND** for further proceedings consistent with this opinion.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2001 FED App. 0070P (6th Cir.)
File Name:  01a0070p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

SOUTHWEST WILLIAMSON
COUNTY COMMUNITY
ASSOCIATION, INC., a non-
profit Tennessee Corporation,
      *Plaintiff-Appellant,*

     *v.*

RODNEY E. SLATER, in his
official capacity as Secretary
of the United States
Department of Transportation;
JANE F. GARVEY, in her
official capacity as Acting
Administrator, Federal
Highway Administration;
JOHN BRUCE SALTSMAN, SR.,
in his official capacity as
Commissioner, Tennessee
Department of Transportation;
JAMES SCAPELLATO,
     *Defendants-Appellees.*

No. 00-5075

1

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 97-00734—Todd J. Campbell, District Judge.

Argued: September 12, 2000

Decided and Filed: March 14, 2001

Before: BOGGS and MOORE, Circuit Judges; DOWD,
District Judge.

_____

**COUNSEL**

**ARGUED:** Joe W. McCaleb, Hendersonville, Tennessee, for
Appellant.    Michael L. Roden, ASSISTANT UNITED
STATES ATTORNEY, Nashville, Tennessee, Michael W.
Catalano, OFFICE OF THE ATTORNEY GENERAL,
Nashville, Tennessee, for Appellees.   **ON BRIEF:** Joe W.
McCaleb, Hendersonville, Tennessee, for Appellant. Michael
L. Roden, ASSISTANT UNITED STATES ATTORNEY,
Nashville, Tennessee, Michael W. Catalano, OFFICE OF
THE ATTORNEY GENERAL, Nashville, Tennessee, for
Appellees.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge.  Plaintiff-
Appellant Southwest Williamson County Community
Association ("Association") appeals the district court's denial
of its application for a preliminary injunction to halt
construction on Route 840 South, a 77-mile length of

_____

*The Honorable David D. Dowd, Jr., United States District Judge for
the Northern District of Ohio, sitting by designation.

second test, that the relevant federal decision-makers do not
have authority to exercise sufficient control or responsibility
over Route 840 South so as to influence the outcome of the
project, we agree no preliminary injunction should issue.[18]

**VI. CONCLUSION**

Based on our analyses under our alternative tests, we
conclude that the district court did not abuse its discretion by
deciding that the Association was unable to show a
substantial likelihood of success on the merits of its claim for
a preliminary injunction halting construction of Route 840
South.  Therefore, we **AFFIRM** the district court's denial of
the motion for a preliminary injunction.   We observe,
however, that only the motion for a preliminary injunction
was before the district court. The disposition of this case does
not dispose of the Association's other claims for a declaratory
judgment and a permanent injunction.   Thus, we also

_____

state could not withdraw one segment of highway from federal funding
at the final stages of the project solely in order to avoid NEPA
requirements); *Scottsdale Mall v. Indiana*, 549 F.2d 484, 489 (7th Cir.
1977), *cert. denied*, 434 U.S. 1008 (1978) (finding that state highway
which proceeded with federal participation through programming,
location, design, preliminary engineering, and right-of-way acquisition
stages created major federal action and that state could not withdraw
portion of highway from federal funding consideration to avoid NEPA
compliance at such late stage of project).  However, as the district court
noted, the Association dropped its segmentation claim in its amended
complaint, s*ee Southwest III*, 67 F. Supp. 2d at 881-82 n.10, and the
Association never pursued a "de-segmentation" theory.

[18]We need not decide, for purposes of this case, under what
circumstances the totality of federal agency involvement in a non-federal
program would rise to the level of "major federal action" when at least
one federal agency has jurisdiction over a portion of the state project. We
only note that, under some circumstances, such federal involvement
clearly would indicate that the federal agencies have authority to exercise
sufficient control or responsibility over the non-federal project so as to
influence the outcome of the project sufficient to create a "major federal
action."

*Macht*, 916 F.2d at 18. This case would be different if the Association sought an injunction because FHWA had refused or had not yet had the opportunity to review the interchange EAs, or the Army Corps of Engineers had not yet responded to the state's wetland EAs. As the district court found, however, all applicable federal agencies fulfilled or were fulfilling their duty, pursuant to their respective statutory jurisdictions, to issue the appropriate environmental documentation.[16] Instead, the Association seeks to enjoin the state and halt construction of the entire non-federal project so that the FHWA can review the environmental impact of the project, despite the fact that the federal agency lacks jurisdiction over the highway corridor. As the district court stated, the Association is free to contest the agencies' responses as insufficient under NEPA, should it so choose. No court has ever approved the kind of injunction the Association requests.[17] Because we conclude, pursuant to our

---

[16] We note that the applicable analysis is not necessarily how large a percentage of the project requires federal approval. The district court observed that "the areas controlled by FHWA, the National Park Service and the Army Corps of Engineers constitute a very small percentage of the overall 77-mile 840 South project." *Southwest III*, 67 F. Supp. 2d at 882. Had none of these agencies had the opportunity to review the state's plans for constructing the highway when the state had begun to build various segments, however, the Association would more easily have been able to demonstrate that state action was limiting federal decision-makers' choice of reasonable alternatives. The Association might also have demonstrated that federal agencies had authority to exercise sufficient control or responsibility over the non-federal project so as to influence the outcome of the project.

[17] Under the authority-to-control test, courts have found "major Federal actions" despite a federal agency's lack of jurisdiction over the non-federal project when the court determines either (1) that the state was improperly attempting to "segment" its project into discrete sections in order to circumvent NEPA requirements or (2) that the state was improperly attempting to "de-segment" a major federal action to permit construction of one segment without complying with NEPA. *See Ross*, 162 F.3d at 1053 (holding that highway which was planned in conjunction with FHWA and funded by Congress was major federal action and that

---

highway which was designed to bypass Nashville, Tennessee by running south of the city and connecting Interstate 40 ("I-40") West, which radiates west of the city, and I-40 East. The issue before us is whether the district court abused its discretion in denying the Association's motion for a preliminary injunction after finding that the Association was not likely to succeed on the merits of its case. The district court entertained the Association's motion for a preliminary injunction on remand from this court to determine three issues, only two of which were argued to the district court and only one of which is before us on appeal: whether construction of the fifty-three mile corridor of the highway constitutes a "major Federal action[]" under 42 U.S.C. § 4332(C) such that the Federal Highway Administration ("FHWA") is required to respond to the state's Environmental Assessment ("EA") with certain documentation on the highway's environmental impact. Because we conclude that the district court did not abuse its discretion, we **AFFIRM** the denial of the preliminary injunction and **REMAND** for further proceedings consistent with this opinion.

## I. FACTS

This case comes to us on appeal for the second time, and we therefore incorporate as factual background our earlier opinion, *Southwest Williamson County Community Ass'n v. Slater*, 173 F.3d 1033 (6th Cir. 1999) (*Southwest II*). The Association, a non-profit corporation comprised of members who live and work in Williamson County, first brought suit in federal district court against federal and state defendants seeking declaratory and injunctive relief to halt construction of Route 840 South.[1] The highway, designed to provide an

---

[1] The Association named as defendants Rodney E. Slater, Secretary of the Department of Transportation; Jane F. Garvey, Acting Administrator of the FHWA; James Scapellato, Division Administrator of the FHWA; and John Bruce Saltsman, Sr., the Commissioner of the Tennessee Department of Transportation ("TDOT"). We will refer to the Secretary of the Department of Transportation and the FHWA officials

alternative route around Nashville, begins at I-40 West, runs south of the city through several counties including Williamson County, and crosses two federal interstates, I-65 South and I-24, before terminating at I-40 East.[2]  The Association's suit alleged that defendants were violating the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*[3] and the Intermodal Surface Transportation Efficiency Act ("ISTEA"), 23 U.S.C. §§ 134, 135.  It also alleged a state law claim under the Petroleum Products and Alternative Fuels Tax Act, Tenn. Code Ann. § 67-3-2003. The district court, in a memorandum opinion, dismissed the Association's claims.  *See Southwest Williamson County Community Ass'n v. Slater*, 976 F. Supp. 1119 (M.D. Tenn. 1997) (*Southwest I*).  The district court found the NEPA claims barred by the applicable statute of limitations and dismissed the ISTEA claim after finding that the statute did

---

as the "federal defendants."

[2]The portion of the highway from I-40 East to I-24 is complete and is not contested in this lawsuit.  The other two sections of the highway, from I-24 to the I-65 South interchange and from I-65 South to the I-40 West interchange, are at various stages of construction and are at issue in this appeal.

[3]NEPA, which is "our basic national charter for protection of the environment," 40 C.F.R. § 1500.1(a), requires all federal agencies to prepare an environmental impact statement or "EIS" for "major Federal actions significantly affecting the quality of the human environment,"42 U.S.C. § 4332(C).  The responsible federal, or in some circumstances state, agency may first choose to prepare an environmental assessment or "EA," a preliminary document which "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9.  After considering the EA, the agency may then decide to issue either a finding of no significant impact ("FONSI") or a more detailed EIS.  Issuance of either document constitutes "final agency action" for purposes of NEPA actions brought pursuant to the Administrative Procedure Act and triggers the relevant statute of limitations, *see* 5 U.S.C. § 704, on any claims arising from the agency action.  *See Southwest II*, 173 F.3d at 1036.

state, the crucial distinction between the Association's claims and those in *Gilchrist*, which the Association urges us to follow, is that the relevant federal agencies in *Gilchrist* had not yet had the opportunity to issue their environmental review of the county's proposal prior to the initiation of the highway's construction, despite the fact that the agencies *had or would have jurisdiction* over certain sections of the highway.[15]  Concerned that the federal agencies' hands would be tied if the state were permitted to continue constructing the highway, the *Gilchrist* court determined that the aggregate of the federal approvals needed for the project was sufficient to federalize the highway so that the court could enjoin state construction in order to allow the federal agencies time to fulfill their NEPA obligations.

The situation we are confronted with is not one in which the Association seeks to enjoin "state . . . action on an entire project . . . until the federal agencies that must approve particular portions of the project have complied with NEPA."

---

Williamson County; and (3) the state's formal application to the FHWA in November, 1991 for interstate status, which was subsequently withdrawn.  We agree with the district court's assessment that these are not the sort of federal agency approvals that may transform a non-federal project into a major federal action.  *See Southwest III*, 67 F. Supp. 2d at 883-85.  They also do not restrict a federal decision-maker's choice of reasonable alternatives regarding approvals for construction of the highway under our first test.

[15]This case is also not like the one in *Save Barton Creek*, in which the Fifth Circuit evaluated whether the construction of state-funded highway segments constituted a "major federal action" because the proposed highway of which they were a part might one day be eligible for federal funding.  Noting that "[t]he only federal touching of the projects at all consists of state officials taking advantage of the FHWA's early coordination procedure and beginning to compile NEPA compliance documentation so as to preserve state eligibility for federal funding," the Fifth Circuit found that neither highway segment had "yet acquired the status of a formal proposal requiring federal action." *Save Barton Creek*, 950 F.2d at 1135-36.  In our case, in contrast, the FHWA has issued two FONSIs already in response to state proposals.

further noted that FERC did not contribute any funds to the construction of the pipeline. While FERC was free to conduct an environmental review of any part of the pipeline project it chose, the court found that NEPA did not require the agency to review any other portion of the project other than the part over which it exercised control. *See id.* at 604-05. As the court noted, "[a]lthough a review of environmental impact by FERC of areas outside of its required jurisdiction might be desirable, NEPA case law requires only that an agency comply with the 'statutory minima.'" *Id.* at 605 (quoting *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 548 (1978)).

Because no federal agency has jurisdiction over the non-federal project,[13] we must conclude that, as in *Virginia Beach*, the federal defendants lack sufficient control or responsibility over the state highway to influence the project's outcome.[14] Although the district court did not explicitly so

---

[13]We note that the agencies' lack of jurisdiction over the highway corridor would not influence our analysis under the first test, namely whether the federal decision-makers' choice of reasonable alternatives was restricted by the state's actions. We established under our first test that the federal decision-makers in this case did not render decisions under pressure from the state's activities. Had we concluded that the federal decision-makers' choices were limited by state actions, then we would have deemed the non-federal project a "major federal action," despite the agencies' lack of jurisdiction. When there is no pressure on federal decision-makers, however, then the absence of jurisdiction becomes the determinative factor.

[14]The Association does not allege that there are any other proposals relating to construction of the highway pending before any other federal agency. In its amended complaint, the Association does point to several other federal agency involvements in the construction of Route 840 South, namely: (1) FHWA's partial funding and approval of the Nashville Long Range Transportation Plan Conformity Redetermination required by the Clean Air Act Amendments of 1990; (2) FHWA funding of the Nashville-Metropolitan Planning Organization's Unified Planning Work Programs from 1995 through 1999, which included three traffic capacity analyses for interchanges in Wilson County, Rutherford County, and

---

not authorize a private right of action. The district court then declined to exercise supplemental jurisdiction over the state law claim.

On appeal, this court affirmed in part, vacated in part, and remanded in part the district court's decision.[4] On the NEPA claims, which involved allegations that the defendants violated FHWA regulations that implement NEPA as well as a violation of NEPA itself, this court affirmed the district court's dismissal on statute-of-limitations grounds as to claims involving two EAs.[5] We concluded that because the FHWA had responded to each EA with a FONSI, "final agency action" had occurred pursuant to the APA and that, consequently, the relevant statute of limitations had expired. *See Southwest II*, 173 F.3d at 1036. However, as to a third EA analysis of the fifty-three mile highway corridor from I-24 to I-40 W excluding the interchanges, which was voluntarily prepared by the state in 1989, no action was taken by the FHWA. The federal defendants argued that they were not required to respond to the EA because construction of the highway corridor was not a "major Federal action[]" under 42 U.S.C. § 4332(C). This court remanded to the district court to determine whether, indeed, the highway corridor was a major federal action for NEPA purposes. We then vacated the district court's decision with respect to the ISTEA claim and remanded for further proceedings, noting that the district

---

[4]This court dismissed the state defendant, TDOT, because it concluded that the Association could not bring suit against the agency under NEPA, which does not authorize a private right of action, or the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, which does not apply to state agencies. *See Southwest II*, 173 F.3d at 1035-36.

[5]The first EA was an analysis of the proposed interchanges at the intersections of Route 840 South with I-40 East and I-24. The second EA was an analysis for proposed interchanges at I-65 South and I-40 West. Both EAs were prepared by the TDOT in 1988. The FHWA issued a FONSI with respect to the first EA in February 1989 and with respect to the second in May 1990.

court should review its decision to decline to exercise supplemental jurisdiction over the state law claim in light of the "potential continued viability" of the federal claims. *Southwest II*, 173 F.3d at 1037-38 & n.2.

Following remand, the federal defendants argued to the district court that the case was moot; the Association lacks standing; there is no private right of action under ISTEA; and the doctrine of laches should bar the litigation. Joint Appendix ("J.A.") at 19-21 (Federal Defendants' Response on Remand). As the district court noted, the federal defendants completely failed to address this court's question whether the construction of the corridor of Route 840 South constitutes a major federal action, notwithstanding the absence of federal funding, such that NEPA requirements apply. *See Southwest Williamson County Community Ass'n v. Slater*, 67 F. Supp. 2d 875, 878 n.5 (M.D. Tenn. 1999) (*Southwest III*) ("Although the pivotal issue in this case is whether 840 South is a 'major federal action,' the Federal Defendants do not address how the issue applies to the totality of the federal actions alleged by the Plaintiff."). The Association then filed an amended complaint in the district court seeking a declaratory judgment that the unfinished portion of Route 840 South is a "major federal action" as well as an order to require the federal defendants to prepare an EIS for the unfinished portion of the highway; a preliminary injunction halting construction; and a permanent injunction. The Association pressed its NEPA claims as well as its state law claim, but abandoned its ISTEA claim. The Association then filed a motion for a preliminary injunction.

After holding a hearing, the district court denied the Association's motion for a preliminary injunction. The district court first assessed the Association's likelihood of success on the merits of its claims, the first prong of the relevant analysis for a preliminary injunction. Analyzing the relevant statutory language and associated regulations, the district court noted that "most circuit courts look to whether a federal agency has the ability to influence or control the

funding for Route 840 South. *See Southwest III*, 67 F. Supp. 2d at 885. Indeed, should the state seek federal funding in the future, absent a change in the federal regulations, its failure to comply with NEPA would make it ineligible to receive such funding.[12] *See Ross v. FHWA*, 162 F.3d 1046, 1048 (10th Cir. 1998) ("States seeking federal highway funds must submit to FHWA a list of proposed transportation projects . . . . Upon final approval of the project and compliance with applicable federal laws and regulations, including NEPA, FHWA reimburses the state for a portion of the project's cost."); *Save Barton Creek Ass'n v. FHWA*, 950 F.2d at 1134 n.6 ("In addition to being part of an FHWA approved federal-aid highway system . . ., a project must also meet the requirements of environmental regulations to qualify as an FHWA project."). Thus, there is no statutory basis to establish FHWA authority over the highway corridor.

This case presents facts similar to those in *North Carolina v. City of Virginia Beach*, in which North Carolina sought to compel FERC to conduct an environmental review of all potential effects of the City's pipeline construction, including any effects which fell outside FERC's decision-making jurisdiction. The Fourth Circuit engaged in a review of FERC's jurisdiction and noted that the "FERC has no licensing power or veto power over those parts of the pipeline that fall outside of . . . the hydropower facility at Lake Gaston[]." *Virginia Beach*, 951 F.2d at 604. The court

---

[12]According to 23 C.F.R. § 1.9(a) "[f]ederal-aid funds shall not participate in any cost which is not incurred in conformity with applicable Federal and State law . . . . Federal funds shall not be paid on account of any cost incurred prior to authorization by the Administrator to the State highway department to proceed with the project . . . ." Alternatively, the Administrator may, according to § 1.9(b), retroactively approve the grant of federal-aid funds to a State highway department if "there has been substantial compliance with all other requirements prescribed by the Administrator, and full compliance with requirements mandated by Federal statute." 23 C.F.R. § 1.9(b). Under either scenario, failure to comply with NEPA would preclude the state from receiving federal-aid funds.

Moreover, it is clear that agency approval of the interchanges must conform with NEPA procedures. FHWA regulations stipulate that NEPA and the CEQ regulations apply to "actions where the Administration exercises sufficient control to condition the permit or project approval." 23 C.F.R. § 771.109(a)(1). An "action" in turn is defined as an activity such as "changes in access control . . . which may or may not involve a commitment of Federal funds." 23 C.F.R. § 771.107(b). On a plain reading of the regulations, agency review of changes in access control, i.e. interchanges, invokes NEPA procedures; interchange construction must therefore be a major federal action which requires the federal agency to issue either a FONSI or an EIS when approving it.[11] *Cf. West*, 206 F.3d at 926 n.6 (concluding that FHWA's obligation to approve changes to interstate interchanges constitutes "major federal action").

No part of the statute confers jurisdiction on the FHWA, however, to oversee the construction of the highway corridor that runs between the interchanges unless the state attempts to comply with federal regulations in order to seek federal reimbursement for construction costs. Importantly, the Association no longer claims that the state is seeking federal

[11]The federal defendants argue that they did not need to respond to the state's interchange EAs because changes in access control are "likely" subject to a "categorical exclusion" ("CE") under the regulations, meaning that they are actions "that do not individually or cumulative[ly] have a significant environmental effect" and are excluded from the requirement to prepare an EA or an EIS. 23 C.F.R. § 771.115(b). Whether or not changes in access control are actions that meet the criteria in §§ 771.117(d) for a CE, *cf. West v. Sec'y of Transp.*, 206 F.3d 920, 928 (9th Cir. 2000) ("changes in access control" as listed in § 771.117(d)(7) do not encompass interchanges), the federal defendants have glossed over the fact that they failed to follow proper procedures to establish that the interchanges are CEs. According to the pertinent regulations, the FHWA may designate and approve an action as a CE under this subsection only after the applicant "submit[s] documentation which demonstrates that the specific conditions or criteria for these CEs are satisfied and that significant environmental effects will not result." 23 C.F.R. § 771.117(d). There is no dispute that such designation and approval did not occur here.

non-federal activity" when assessing whether such activity constitutes a "major Federal action[]" under NEPA. *Southwest III*, 67 F. Supp. 2d at 880. After evaluating the numerous federal actions which the Association alleges constitute proof of the federalization of the highway,[6] the

[6]The district court considered the following federal actions as alleged by the Association:
(1) Federal approval of the design, construction, location and alignment of 840 South with existing interstate highways (Two EAs/FONSIs) [The interchange approvals];
(2) FHWA consultation with TDOT [Tennessee Department of Transportation] and the National Park Service to determine where 840 South will cross the federally-protected Natchez Trace Parkway;
(3) The Secretary of the Interior's permission, control and approval of a right-of-way across the federally-protected Natchez Trace Parkway including mitigation to historic properties pursuant to Section 106 of the National Historic Preservation Act and mitigation and consultation to protect the Eggert sunflower pursuant to the Endangered Species Act (Draft EA has been issued);
(4) Secretary of the Army's review, approval and permitting three separate crossings of waters of the United States including filling wetlands along the 840 South route (Two EA/FONSIs issued);
(5) FHWA approval of the Nashville Long Range Transportation Plan Conformity Redetermination required by the Clean Air Act Amendments of 1990 without which the continued construction of 840 would not be allowed;
(6) The FHWA funding of a study resulting in the Air Quality Conformity Redetermination mentioned above; FHWA funding of the NMPO's [Nashville-Metropolitan Planning Organization's] Unified Planning Work Programs from 1995 through 1999 which included three traffic capacity analysis for interchanges in Wilson County, Rutherford County and Williamson County; and
(7) The formal application by the State Defendant to the Federal Defendant in November, 1991, for federal interstate status, subsequently withdrawn for two principal reasons: 1) The State did not want to comply with NEPA; and 2) The State can build 840 South, then apply for interstate status at a later time, which would be granted after only a simple inspection to determine whether or not the road was built according to geometric

district court determined that the actions in aggregate did not "give FHWA authority to control the 840 South Highway Project and thereby turn it into a 'major federal action.'" *Southwest III*, 67 F. Supp. 2d at 882. The district court then briefly evaluated the other three factors pertinent to a request for a preliminary injunction, namely whether irreparable harm will occur in the absence of an injunction; whether substantial harm to others will occur should an injunction issue; and whether the public interest is advanced by the injunction. Presuming, arguendo, that the highway constituted a major federal action and that irreparable harm *will* occur to the surrounding environment without an injunction, the district court found that the cost to the state, the inconvenience to the public, and the Association's long delay in bringing suit weighed against the issuance of a preliminary injunction. *See Southwest III*, 67 F. Supp. 2d at 885-86. The district court also found that the Association was unlikely to succeed in federal court on the merits of its state law claim based on the abstention doctrine since the Association was already litigating the state law claim in state court. *See id.* at 885.

## II. JURISDICTION

The district court had jurisdiction of this action under 28 U.S.C. § 1331. Following the district court's order, the Association filed a motion with the district court for interlocutory review under 28 U.S.C. § 1292(b). The district court granted the motion, but this court denied it and instructed the district court clerk to file the motion as a regular notice of appeal under 28 U.S.C. § 1292(a)(1). We therefore have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) over the Association's timely filed appeal.

---

designs.
*Southwest III*, 67 F. Supp. 2d at 878-79.

that the Association does not seek to enjoin construction of the highway in order to allow the Secretary of the Interior time to respond to the state's EA. Therefore, under our first test, we conclude that the state's work on Route 840 South did not restrict the federal decision-makers' choice of reasonable alternatives.

### 2. Agency Control or Responsibility for Outcome

Pursuant to our second test, which we use as an alternative basis of analysis, we evaluate whether the FHWA and other federal agencies have sufficient control or responsibility over the construction of Route 840 South to influence the outcome of the project. We focus first on the FHWA's jurisdiction over the state project because the Association seeks to compel the FHWA to assume responsibility for assessing all environmental consequences of the highway corridor construction. FHWA clearly has jurisdiction over the four interchanges where Route 840 South intersects with federal highways. According to 23 U.S.C. § 111(a), a provision in the Federal-Aid Highways Act which governs the FHWA's authority with respect to state highway projects, "[a]ll agreements between the Secretary and the State highway department for the construction of projects on the Interstate System shall contain a clause providing that the State will not add any points of access to, or exit from, the project in addition to those approved by the Secretary in the plans for such project, without the prior approval of the Secretary." Thus, the FHWA is required to approve any state-proposed construction of interchanges with a federal highway. *See* 23 U.S.C. § 103(c)(3).

---

The state also engaged in formal consultation, pursuant to § 7 of the Endangered Species Act, with the U.S. Fish and Wildlife Service ("USFWS") and the NPS over possible impact on the Eggert sunflower, a species proposed for listing as endangered. In 1998, the USFWS determined that Route 840 South would not adversely affect the sunflower. J.A. at 142.

with FONSIs.[9]   The Association does not allege that the Secretary of the Army was pressured to render its decision or that its choice of action was limited by the state's construction.

Next, after submitting five preliminary draft EAs to the National Park Service ("NPS"), the state submitted a final draft EA in October 1996 to the Secretary of the Interior seeking approval of its EA and a right-of-way to cross the federally-protected Natchez Trace Parkway. J.A. at 88. The Secretary of the Interior has not, according to the record, responded to the state's draft EA with either an EIS or a FONSI. While we are concerned that the state began building Route 840 South prior to receiving final approval from the Secretary of the Interior, we note that the Association concedes that there has been extensive contact, beginning as early as 1990, J.A. at 74, between the state and the NPS, a division of the Department of the Interior, regarding where the highway should cross the Parkway.[10]   We also observe

---

[9]The Association states in its amended complaint in the district court that "[t]he State Defendant has not yet applied for other Clean Water Act permits needed along the route" but no evidence of any improper conduct on the part of the state has been argued to this court. J.A. at 31 (Compl. ¶ IV.A.4).

[10]In 1990, the state TDOT began communicating with the NPS regarding the location of the Parkway crossing. In May 1990 and May 1991, officials from the NPS, the FHWA, and the TDOT attended a field review of the Parkway to examine proposed Parkway crossings. J.A. at 78, 81, 83. The state was asked to review several alternatives to its proposed crossing site.

Subsequent to preparation of the 1996 draft EA, the state, the NPS, and the Advisory Council on Historic Preservation entered into a formal agreement for preservation of the Natchez Trace Parkway pursuant to § 106 of the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.* The state agreed to mitigate certain impacts on the Parkway. J.A. at 131-35. For example, should the TDOT discover American Indian cultural sites during the construction of the Parkway crossing, the state obligated itself to halt construction immediately and make reasonable efforts to protect the items discovered. J.A. at 132.

### III. MOOTNESS

The federal defendants have persistently argued throughout this appeal that the instant case is moot. Article III of the U.S. Constitution dictates that this court must have a justiciable case or controversy before it in order to address the issues presented. Although we previously adjudicated this case on the merits in *Southwest II*, it is our continuing obligation to assess the justiciability of the claims before us because "[t]he mootness inquiry must be made at every stage of a case." *McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 458 (6th Cir. 1997) (*en banc*). Under the "case or controversy" requirement, this court has no authority to issue a decision which would not affect the rights of the litigants. "The test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties." *Id.* (internal quotation omitted).

According to federal defendants, because they have already issued approvals for the four interstate interchanges over which they have jurisdiction, "[t]here is no prospective Federal action by the Secretary, United States Department of Transportation that might be enjoined by this Court." Appellee's Br. at 25. Neither the fact that federal defendants have issued two FONSIs for the interchange EAs, nor the FHWA's lack of authority to force the State to cease construction of the highway moots this case. If we conclude that the highway corridor constitutes a "major federal action," then we have the authority to instruct the district court to enjoin the state from further construction on the highway. We may also instruct the FHWA to respond to the corridor EA with a FONSI, or an EIS, as appropriate. *See* 5 U.S.C. § 706(1) ("To the extent necessary to the decision . . . [t]he reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed.") "Clearly, therefore, the relief sought by the [Association] in this appeal would, if granted, make a difference to the legal interests of the parties." *McPherson*, 119 F.3d at 458-59 (internal quotation omitted). This case is not rendered moot merely because the

federal defendants assert that, under their own interpretation of the statute, they are not required to act. Finally, we note that there is ample evidence in the record that the highway construction is, despite the federal defendants' suggestions to the contrary, clearly an ongoing project, which reinforces our conclusion that any action on our part would significantly affect the parties' interests.

## IV. STANDARD OF REVIEW

There are four criteria for assessing whether to issue a preliminary injunction. The district court must consider: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *McPherson*, 119 F.3d at 459 (internal quotation omitted). We review the district court's decision to deny the Association's motion for a preliminary injunction for an abuse of discretion. Under this standard, we defer to the district court's findings of fact unless they are clearly erroneous, but we review its legal conclusions de novo. *See Sandison v. Michigan High Sch. Athletic Ass'n*, 64 F.3d 1026, 1030 (6th Cir. 1995). An agency's determination that its actions do not constitute a "major Federal action" is reviewed for reasonableness under the circumstances. *Sugarloaf Citizens Ass'n v. FERC*, 959 F.2d 508, 512 (4th Cir. 1992).

## V. ANALYSIS

The Association seeks to enjoin, pursuant to NEPA, further construction of Route 840 South until the FHWA responds to the state's highway corridor EA with either a FONSI or a more detailed EIS. Although it does not dispute the fact that Route 840 South has been exclusively funded by the state, the Association argues that the federal government has failed to fulfill its obligation under NEPA to assess comprehensively

### 1. Restricting Choice of Reasonable Alternatives

Employing our first test, we evaluate whether the state's actions restricted or limited the federal decision-makers' choice of reasonable alternatives when granting federal approvals for the highway construction. As noted previously, the FHWA issued two FONSIs for the interchange EAs in 1989 and 1990. The first segment of the highway is not at issue in this case. Construction on the second segment of the highway, from I-24 to I-65 South, did not begin until 1995. Work on the third section, from I-65 South to I-40 W, began in late 1997 and is still substantially incomplete. Actual construction and paving of the third section has not, according to the record before us, even begun. In contrast to the situation in *Gilchrist*, then, we conclude that the FHWA was afforded ample time and opportunity to respond to the state's proposal before action by the state which would harm the environment or limit the agency's choice of reasonable alternatives, the concerns enunciated by the CEQ regulations.

The other federal agency approvals required for construction of the highway involve the second and third sections of Route 840 South. In response to the state's requests, the Army Corps of Engineers issued several Nation-Wide Permits ("NWPs") and § 404 permits allowing the state to cross several streams and fill almost four acres of wetlands.[8] J.A. at 144-73. The NWP permits for stream crossings were approved by the Army Corps in 1996 and the other § 404 permits and FONSIs were issued in 1997 and 1999, respectively. J.A. at 144-47, 149, 156-58. The Secretary of the Army also duly responded to two state EAs

---

[8] It is true, as the Association points out, that the EPA and the Department of the Interior opposed the issuance of one of the § 404 permits. J.A. at 160-72.

comply with NEPA" and that "the Army Corps has discretion over only a negligible portion of the entire project," the court found that the federal involvement in the state project was insufficient to "federalize" it. *Macht*, 916 F.2d at 18-19.

With the CEQ regulations and case law in mind, we conclude that there are two alternative bases for finding that a non-federal project constitutes a "major Federal action" such that NEPA requirements apply: (1) when the non-federal project restricts or limits the statutorily prescribed federal decision-makers' choice of reasonable alternatives; or (2) when the federal decision-makers have authority to exercise sufficient control or responsibility over the non-federal project so as to influence the outcome of the project.[7] If either test is satisfied, the non-federal project must be considered a major federal action. Both tests require a situation-specific and fact-intensive analysis. Although it employed a somewhat different legal standard from the alternative tests that we enunciate today, we believe that the district court did not abuse its discretion when it evaluated the facts even as measured against either correct legal standard.

---

[7] We distinguish our alternative tests from the single test employed by the district court and various other circuit courts. The district court simply analyzed the various agency actions to determine whether they conferred on FHWA the "authority to control" the state highway project. *Southwest III*, 67 F. Supp. 2d at 882. *See also United States v. S. Florida Water Mgmt. Dist.*, 28 F.3d 1563, 1572 (11th Cir. 1994), *cert. denied sub nom. Western Palm Beach County Farm Bureau, Inc. v. United States*, 514 U.S. 1107 (1995) ("The touchstone of major federal activity constitutes a federal agency's authority to influence nonfederal activity."); *Village of Los Ranchos de Albuquerque v. Barnhart*, 906 F.2d 1477, 1482 (10th Cir. 1990), *cert. denied*, 498 U.S. 1109 (1991) (same); *Save Barton Creek*, 950 F.2d at 1134 ("The distinguishing feature of 'federal' involvement is the ability to influence or control the outcome in material respects.") (internal quotation omitted). We believe that the "authority-to-control" standard will not always adequately encompass the concerns of the CEQ regulations, to which we defer.

the environmental consequences of constructing a four-lane highway through a largely rural area of middle Tennessee. Pointing to thirty-one separate instances of alleged federal control and decision-making which serve to "federalize" the entire highway project, including the four federal interchange approvals by the FHWA, the Association strongly argues that there is "massive and pervasive federal control and influence over nearly every aspect of the planning and construction of the Route 840 South corridor including the FHWA's continuing responsibility to ensure the interstate interchanges comply with federal regulation." Appellant's Reply Br. at 13. Federal defendants argue, in response, that Route 840 South was designed, constructed, and funded by the state; that they lack jurisdiction under the relevant statute over the state's construction of the highway corridor; and that they were not even obligated by statute or regulation to issue FONSIs in response to the state's interchange EAs.

### A.  Application of NEPA

Among the purposes of NEPA are "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. The statute requires, to the fullest extent possible, that all agencies of the Federal Government:

[I]nclude in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C). NEPA is one of our most important tools for ensuring that all federal agencies take a "hard look" at the environmental implications of their actions or non-actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21. The statute is procedural in nature and does not require "that agencies achieve particular substantive environmental results" but it is "action-forcing" in that it compels agencies to collect and disseminate information about the environmental consequences of proposed actions that fall under their respective jurisdictions. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989). FHWA is governed by a set of regulations that apply NEPA and Council on Environmental Quality ("CEQ") regulations, *see* 23 C.F.R. § 771.101 *et seq.*, to FHWA actions. Thus, the FHWA is required to conduct a review of all "major Federal action[s]" within its jurisdiction to ensure that they comply with NEPA requirements.

Typically, a project is considered a major federal action when it is funded with federal money. This case, however, requires us to determine at what point a state-funded project is transformed into a major federal action by virtue of multiple federal agencies' involvement in the project. This determination admits of no simple litmus test. In order to evaluate whether the FHWA has been remiss in its responsibilities under NEPA, we will review de novo the district court's legal conclusions regarding the extent of federal involvement required to convert a state highway project into a major federal action.

the city's desire to work on a small part of the pipeline falling outside of the FERC's jurisdiction. *See id.* at 598. Although the court noted that "there may come a point where the construction and the concomitant expenditure of funds would create so much pressure that the completed portions of the pipeline would stand like a gun barrel aimed at FERC," the court concluded that Virginia Beach had not pressed its claim that far because it sought to proceed on only two small areas of the pipeline pending FERC's approval. *Id.* at 602 (internal quotation omitted). Ultimately concluding that "construction which lies beyond the boundaries of FERC's jurisdiction can be enjoined only when it has a direct and substantial probability of influencing FERC's decision," the court determined that Virginia Beach had failed to meet that standard. *Id.* at 603.

In *Macht v. Skinner*, 916 F.2d 13, 19 (D.C. Cir. 1990), the D.C. Circuit approved of the basic reasoning in *Gilchrist*, namely the proposition that "the state may not begin construction of any part of a project if the effect of such construction would be to limit significantly the options of the federal officials who have discretion over substantial portions of the project." The issue in *Macht* relevant to this case was whether a state-funded light-rail project was sufficiently federalized by federal agency involvement such that the state was required to follow NEPA procedures. Plaintiffs in this case sought an injunction on construction, alleging that state and federal officials failed to comply with NEPA. First, the D.C. Circuit aptly noted that NEPA applies only to federal agencies, not to the state or private parties. Therefore, the court declined to find the state in violation of NEPA and to issue an injunction against it, despite the fact that the light rail project required a federal wetlands permit from the Army Corps of Engineers. Instead, the court characterized the question before it as "whether state or private action on an entire project should be enjoined until the federal agencies that must approve particular portions of the project have complied with NEPA." *Macht*, 916 F.2d at 18. Noting that "there is no allegation that the Army Corps has failed to

the CEQ regulations sought to avoid a situation where the non-federal actor presents the federal agency with a *fait accompli* which significantly limits the federal agency's ability to reject the proposal. *See Gilchrist*, 808 F.2d at 1042. Crucial to the Fourth Circuit's decision, of course, was the fact that the plaintiff sought to enjoin construction until the applicable federal agencies were afforded the opportunity to respond to the environmental issues falling under their respective jurisdictions. The plaintiff did not seek a comprehensive EIS from the Secretary of the Interior for the entire highway, for example; rather, the plaintiff sought an injunction to allow the Secretary time to respond to the issue of the conversion of park land to a non-recreational use, which fell under the Secretary's jurisdiction.

In a subsequent case, the Fourth Circuit adhered to the basic principle that non-federal action should not be permitted to limit the applicable federal agencies' choice of reasonable alternatives. In *North Carolina v. City of Virginia Beach*, 951 F.2d 596 (4th Cir. 1992), the Fourth Circuit revisited the issue when the aggregate of federal involvement transforms a non-federal project into a "major Federal action." In this case, North Carolina and other plaintiffs sought an injunction against the construction of a city pipeline connecting Lake Gaston, which sits in North Carolina and Virginia, with the City of Virginia Beach. Although the city had obtained approval from the Army Corps of Engineers for construction of the pipeline, it had yet to gain approval from the Federal Energy Regulatory Commission ("FERC"), which licensed the hydropower facility at Lake Gaston and the immediately surrounding land. The City worried that "an enormous amount of public and political pressure will be put on FERC to approve the project, and FERC will be unable to make a reasoned and independent decision" about the effects of the project on the environment. *Virginia Beach*, 951 F.2d at 602.

The Fourth Circuit reversed the district court's grant of an injunction forbidding any construction on the pipeline because it found that FERC would not be unduly pressured by

## B. Major Federal Actions May Arise From A Non-Federal Project

Federal defendants may be bound by NEPA to perform additional environmental review of Route 840 South, notwithstanding the fact that the project is not federally funded. According to the regulations promulgated by the CEQ, major federal actions "include[] actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. These actions may be "assisted, conducted, regulated, or approved by federal agencies." *Id.* § 1508.18(a). The regulation goes on to provide:

> Federal actions tend to fall within one of the following categories:
>
> * * *
>
> Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

*Id.* § 1508.18(b)(4). These regulations are due substantial deference from reviewing courts. *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979). The regulations clearly indicate that major federal actions need not be federally funded to invoke NEPA requirements. *See* 40 C.F.R. § 1508.18(a); *see also Southwest III*, 173 F.3d at 1037; *Save Barton Creek Ass'n v. FHWA*, 950 F.2d 1129, 1134 (5th Cir.), *cert. denied*, 505 U.S. 1220 (1992); *Macht v. Skinner*, 916 F.2d 13, 18 (D.C. Cir. 1990); *Historic Preservation Guild of Bay View v. Burnley*, 896 F.2d 985, 990 (6th Cir. 1989); *Maryland Conservation Council, Inc. v Gilchrist*, 808 F.2d 1039, 1042 (4th Cir. 1986). Federal defendants' efforts to argue to the contrary are totally unavailing in light of this court's and other circuits' supporting precedent. Of course, federal funding is a significant indication that a project constitutes a major federal

action; however, the absence of funding is not conclusive proof of the contrary. *See Bay View*, 896 F.2d at 990.

In addition, it is apparent that a non-federally funded project may become a major federal action by virtue of the aggregate of federal involvement from numerous federal agencies, even if one agency's role in the project may not be sufficient to create major federal action in and of itself. *See* 40 C.F.R. §§ 1508.25; 1508.27(b) (noting that "more than one agency may make decisions about partial aspects of a major [Federal] action"); *see also Gilchrist*, 808 F.2d at 1042 (holding that "[b]ecause of the inevitability of the need for at least one federal [agency] approval, . . . the construction of the [state] highway will constitute a major federal action"). Thus, the federal defendants' argument that they were only involved in one aspect of the highway's design and approval process, namely the four interchanges, does not necessarily serve to defeat the Association's claim that the pervasiveness of federal activity required to complete the highway converts the project into a major federal action.

## C.  Standard for Evaluating When a Non-Federal Project Becomes a Major Federal Action

Although this circuit has never enunciated a standard for evaluating whether non-federal projects rise to the level of "major Federal action," our sister circuits have undertaken such an examination. In *Gilchrist*, the Fourth Circuit decision on which the Association urges us to rely, the court determined that a county-funded highway was a major federal action because construction of the highway would likely require multiple federal agencies' approval before completion. The highway at issue in *Gilchrist* was designed to cross a state park which was established with the grant of federal funds; therefore, the county needed the approval of the Secretary of the Interior to build the portion of the highway that transversed the park. The Fourth Circuit noted that the county was also likely to need § 404 permits from the Secretary of the Army to dredge wetlands in the park where

the highway crossed a creek. Finally, had the county wanted to seek federal funds for the highway, it would have been required to obtain the approval of the Secretary of Transportation. Determining that "[a] non-federal project is considered a 'federal action' if it cannot begin or continue without prior approval of a federal agency," *Gilchrist*, 808 F.2d at 1042 (internal quotation omitted), the court held that "[b]ecause of the inevitability of the need for at least one federal approval, we think that the construction of the highway will constitute a major federal action." *Id.* Therefore, the court reversed the district court's dismissal of the plaintiff's NEPA claims and remanded for further proceedings, including a determination "whether the program in fact violates NEPA and its regulations by limiting 'the choice of reasonable alternatives' available to federal decision-makers." *Id.* at 1043 (citing 40 C.F.R. § 1506.1(a)(2) (1985)).

Clearly animating the court's analysis was the fact that the state had already begun to build the portions of the highway that entered and exited the park without having obtained the requisite federal approvals to build the middle section. According to the court, the applicable agencies "would inevitably be influenced if the County were allowed to construct major segments of the highway before issuance of a final EIS." *Id.* at 1042. Had it not remanded for consideration of an injunction on the construction, the court reasoned that "[t]he completed segments [of the highway] would stand like gun barrels pointing into the heartland of the park." *Id.* (internal quotation omitted).

The Fourth Circuit's concern that the federal agencies' decision-making would be constrained by premature construction is reflected in CEQ regulations which state that "until an agency issues a record of decision . . . no action concerning the proposal [before the agency] shall be taken which would: "(1) [h]ave an adverse environmental impact; or (2) [l]imit the [agency's] choice of reasonable alternatives." 40 C.F.R. § 1506.1. Clearly, as the court noted,